■ The People of the State of New York, Respondent, v Lukee P. Forbes, Appellant. [975 NYS2d 490]—

Egan Jr., J. Appeal from a judgment of the County Court of Albany County (Herrick, J.), rendered April 29, 2011, upon a

verdict convicting defendant of the crimes of assault in the first degree and robbery in the first degree (two counts).

Late in the evening on June 13, 2010, defendant and his friends, Quayvon M. Young and Roscoe Ervin, who had been drinking alcohol and smoking marihuana, walked to a convenience store located near Albany Medical Center in the City of Albany so that Young could purchase cigarettes. When Young exited the store, he saw defendant and Ervin following the victim, who appeared to be intoxicated. Young observed defendant pick up and drop what he described as a "stick" but was, in reality, a tree branch roughly the diameter of the end of a baseball bat. According to Young, as Ervin and defendant continued to follow the victim, Ervin picked up the discarded tree branch and swung it "[l]ike he was going for a home[ ]run," striking the victim in the head.[1] The three rolled the now unconscious victim over, went through his pockets—with Young taking the victim's credit card and identification and defendant taking the victim's blue cell phone—and "left [him] for dead."[2] The trio then started walking and eventually made their way to the apartment complex where Young's girlfriend resided.

When the victim failed to return home, his brother began sending him text messages inquiring as to his whereabouts. According to Young, defendant had the victim's cell phone and responded to the incoming messages—directing the victim's brother to their location. While searching for the victim during the early morning hours of June 14, 2010, the victim's brother encountered three young men, two of whom he subsequently identified as Young and Ervin, who told him that the victim was attending a party at a nearby apartment. Suspecting that something was not quite right, the victim's brother remained in his vehicle and eventually left the area and reported the victim as missing. The victim eventually regained consciousness and found his way to Albany Medical Center—where he presented with "significant head and facial injuries," including multiple

---

**1.** Ervin's account of the attack differed slightly in that he testified that he, Young and defendant never "really [got] to the . . . store" because they saw the victim stumbling down the street and collectively started to pursue him. As Ervin put it, "We [gave] each other that look like we about to go do this." Although agreeing that defendant was the first one to pick up the branch, Ervin testified that he actually grabbed the branch from defendant and swung it at the victim's head "[l]ike [he] was trying to bring [the victim] down"—describing the sound of the impact as "like a gun almost."

**2.** Although Ervin, too, believed that he had killed the victim, stating, "I thought he was dead," he and Young disagreed as to who had "run" the victim's pockets. Young implicated both himself and defendant in this regard, while Ervin testified that only defendant rifled through the victim's pockets.

skull fractures and a brain contusion, as well as numerous cuts and bruises all over his body.

Later that day, defendant, Young and Ervin—among others—met in the general vicinity of Swinburne Park in the City of Albany and decided to go to Crossgates Mall in the Town of Guilderland, Albany County. Prior to boarding a bus to that location, the trio discarded the victim's blue cell phone and driver's license.[3] Upon arriving at the mall, defendant used the victim's credit card to successfully purchase a quantity of baseball hats. Following a failed transaction at a second store, defendant was apprehended at a bus station outside of the mall.

Young, Ervin and defendant thereafter were indicted and charged with assault in the first degree (two counts), robbery in the first degree (two counts) and robbery in the second degree. Young and Ervin pleaded guilty and agreed to testify against defendant. Following a jury trial, defendant was convicted on all counts; however, because defendant was only 15 years old at the time that the underlying crimes were committed, County Court dismissed the two nonjuvenile offender counts of the indictment as legal nullities (see Penal Law § 30.00 [2]; CPL 310.85 [1], [2]) and sentenced defendant upon the remaining counts to concurrent prison terms of 3⅓ to 10 years. In so doing, County Court declined to accord defendant youthful offender status—instead recommending to the Division of Parole that defendant be held for the maximum time allowed by law. Defendant's motion to set aside the verdict was denied, and this appeal ensued.

Defendant primarily contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence and, further, that certain comments made by the prosecutor during the course of the People's summation deprived him of a fair trial. With respect to defendant's challenge to the underlying verdict,[4] the crux of defendant's argument on this point is that the testimony offered by Young and Ervin was not sufficiently corroborated and, additionally, was so inconsistent as to be deemed unworthy of belief. We disagree.

"New York's accomplice corroboration rule minimally requires

---

**3.** Tashiem Hairston, who met up with Young, Ervin and defendant at Swinburne Park and accompanied them to the mall, testified that while they were en route, Young and defendant were "bragging" that "they did a guy dirty, did him filthy"—meaning that they "beat [him] up real bad."

**4.** Although defendant's legal sufficiency claim is not preserved for our review, this Court's "weight of the evidence review necessarily involves an evaluation of whether all elements of the charged crime[s] were proven beyond a reasonable doubt at trial" (People v Burch, 97 AD3d 987, 989 n 2 [2012], lv denied 19 NY3d 1101 [2012] [internal quotation marks and citations omitted]).

[some] 'corroborative evidence tending to connect the defendant with the commission' of [the underlying crimes]" (*People v Matthews*, 101 AD3d 1363, 1365 [2012], *lv denied* 20 NY3d 1101 [2013], quoting CPL 60.22 [1]). Notably, "[i]ndependent evidence need not be offered to establish each element of the offense or even an element of the offense" (*People v Berry*, 78 AD3d 1226, 1227 [2010], *lv denied* 16 NY3d 828 [2011] [internal quotation marks and citation omitted]; *see People v Matthews*, 101 AD3d at 1365; *People v Rodriguez*, 52 AD3d 1047, 1048 [2008]); rather, "[i]t is enough if [the corroborative evidence] tends to connect the defendant with the commission of the crime[s] in such a way as may reasonably satisfy the jury that the accomplice is telling the truth" (*People v Matthews*, 101 AD3d at 1365 [internal quotation marks and citation omitted]; *see People v Reome*, 15 NY3d 188, 192 [2010]; *People v Pagan*, 87 AD3d 1181, 1182 [2011], *lv denied* 18 NY3d 885 [2012]). In this regard, "even [s]eemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration" (*People v Caban*, 5 NY3d 143, 155 [2005] [internal quotation marks and citation omitted]).

Here, the accomplice testimony offered by Young and Ervin was corroborated by, among other things, (1) defendant's testimony placing him with Young and Ervin both immediately prior to and shortly after the attack, his admitted use of the victim's credit card to make a purchase at the mall and his testimony that he discarded the victim's cell phone—allegedly in Young's possession at the time—while en route to the bus stop on the morning following the assault; (2) the testimony of Young's girlfriend, who stated that she saw Young, Ervin and defendant together during the early morning hours of June 14, 2010, at which time defendant was in possession of a blue cell phone; (3) Hairston's testimony that, on the morning following the attack, defendant was in possession of a blue cell phone and was bragging about the robbery and "[running the victim's] pockets"; (4) the recovery of the tree branch used to strike the victim from the location described by Young and Ervin; and (5) the testimony detailing the recovery of the victim's license, as well as a portion of his blue cell phone, from the general locations where Young, Ervin and defendant each described the items as being discarded. Such proof, in our view, is more than sufficient "to satisfy the minimal corroboration requirement connecting defendant to these crimes and provid[es] a sound basis for the jury to credit the accomplice[s'] testimony" (*People v Matthews*, 101 AD3d at 1365-1366). To the extent that defendant argues that certain of the People's witnesses had prior criminal histories, received advantageous plea bargains in exchange

for testifying and/or testified in an inconsistent fashion, thereby rendering their testimony unworthy of belief, we need note only that all of "these issue[s] were fully explored during cross-examination and . . . credibility questions [are] within the jury's province to resolve" (*People v Sheppard*, 107 AD3d 1237, 1239 [2013] [internal quotation marks and citations omitted]). In light of this evidence, we are satisfied that the verdict is in accord with the weight of the evidence.

We now turn to defendant's argument regarding the People's summation. Summations afford counsel the opportunity to comment upon the evidence adduced at trial and to suggest to the jury whatever inferences and conclusions logically and reasonably may be drawn therefrom. It is, therefore, entirely permissible for counsel not only to highlight the proof favorable to his or her position but, further, to call to the jury's attention evidence that contradicts opposing counsel's theory of the case. In so doing, however, counsel may not become a witness in the case or vouch for the credibility of the witnesses who testified (*see People v Spence*, 92 AD3d 905, 905 [2012]; *People v Russell*, 307 AD2d 385, 386 [2003]), nor may he or she comment upon matters not in evidence or otherwise engage in speculation (*see People v Woodrow*, 91 AD3d 1188, 1190 [2012], *lv denied* 18 NY3d 999 [2012]; *People v Paixao*, 23 AD3d 677, 678 [2005], *lv denied* 6 NY3d 816 [2006]; *People v Washington*, 21 AD3d 253, 253 [2005], *lv denied* 5 NY3d 834 [2005], *cert denied* 546 US 1104 [2006]). To our analysis, the prosecutor strayed far beyond those well-defined parameters here.

During the course of his summation, the prosecutor, among other things, repeatedly vouched for the credibility of the People's witnesses ("He's telling the truth"). Such comments clearly are impermissible (*see People v Spence*, 92 AD3d at 905; *People v Russell*, 307 AD2d at 386). We reach a similar conclusion regarding the prosecutor's statement that if the jury was inclined to believe defendant, he had "a bridge in Brooklyn [to] sell" as well (*see People v Moore*, 115 AD2d 495, 496 [1985]). These errors were compounded by the prosecutor's completely speculative comment that "the only reason that [defendant] wasn't involved in the other robbery that [Young] and [Ervin] committed" not long after the attack upon the victim "was because he couldn't be there with them"—suggesting that had defendant not been in custody at the time that the subsequent robbery was committed, he would have participated in that crime as well. Although the prosecutor's comment in this regard undeniably was improper (*cf. People v Spence*, 92 AD3d at 906), it paled in comparison to his statement that, in order to believe

defendant's version of events, the jury had to accept that there was a far-reaching conspiracy to convict defendant—one that included the trial judge. Specifically, the prosecutor stated, "[H]ere's what you'll have to find to find that the defendant is not guilty. This is what you have to believe. You have to believe there was a conspiracy against [defendant,] that every single one of the witnesses that came in here went over there, put their hand on the Bible, swore to tell the truth, and then lied and made up a story, and that the detectives from the Albany Police Department . . . got together and risked their entire careers and got together with . . . Ervin and . . . Young to frame [defendant]. Then they got me involved to continue prosecuting the case, and then they got Judge Herrick and Judge Breslin to go along with these cooperation agreements and allowed them to come in here and lie."[5]

The problem with the foregoing statement is three-fold. First, the comment made by the prosecutor relative to what the jury would need to believe in order to find that defendant was *not* guilty arguably shifted the burden of proof from the People to defendant. Additionally, the prosecutor's reference to a conspiracy in no way constitutes fair comment upon the evidence adduced. Although defendant indeed testified that Young and Ervin were not being truthful, he never suggested that the People's witnesses, among others, were engaged in a conspiracy to wrongfully convict him, and there is nothing in the record to support such a claim. Finally, there is no question that one of the jury's key roles in a criminal trial is to assess the credibility of the witnesses who testify on behalf of the People and, in those instances where the defendant takes the stand or otherwise presents witnesses in support of his or her defense, to weigh the credibility of the People's witnesses vis-à-vis the defendant's witnesses. Such a "credibility contest" is entirely permissible, and there is nothing inherently prejudicial about that evaluative process. Here, however, the prosecutor's commentary set up a far different credibility contest by suggesting to the jury that it could believe defendant only if it also believed that the trial judge, among others, had permitted the People's witnesses to lie to the jury and/or otherwise engaged in some form of misconduct. Simply put, the prosecutor's conduct in pitting defendant against the very judge who had presided over the course of the trial was inexcusable and, despite defense counsel's prompt objection and County Court's appropriate curative

---

5. Judge Herrick presided over defendant's trial, and Young and Ervin entered their respective guilty pleas before Judge Breslin.

instruction, the prejudicial impact of that conduct cannot be ignored.[6]

Summations rarely are perfect. For that reason, we accord counsel a certain amount of leeway in this regard and recognize that not every improper comment made by the prosecuting attorney during the course of closing arguments warrants reversal of the underlying conviction (see e.g. People v Story, 81 AD3d 1168, 1169 [2011]; People v White, 79 AD3d 1460, 1464-1465 [2010], lv denied 17 NY3d 803 [2011]; People v Newkirk, 75 AD3d 853, 857 [2010], lv denied 16 NY3d 834 [2011]). Rather, reversal "is warranted [only] if the misconduct is such that the defendant suffered substantial prejudice, resulting in a denial of due process" (People v Story, 81 AD3d at 1169; see People v Newkirk, 75 AD3d at 857; People v Russell, 307 AD2d at 386)—a determination that, in turn, hinges upon "the severity and frequency of the conduct, whether the trial court took appropriate action to dilute the effect of the conduct and whether, from a review of the evidence, it can be said that the result would have been the same absent such conduct" (People v Tarantola, 178 AD2d 768, 770 [1991], lv denied 79 NY2d 954 [1992]; accord People v Russell, 307 AD2d at 386; see People v Story, 81 AD3d at 1169).

Here, "given [both the catalogue and] the magnitude of the errors [committed by the prosecutor] and the fact that defendant's credibility was central to his defense," we are unable to conclude that the foregoing errors were harmless (People v Tarantola, 178 AD2d at 770 [internal quotation marks and citation omitted]; see People v Russell, 307 AD2d at 387). Thus, despite the ample evidence to support defendant's conviction, we nonetheless find that the prosecutor's comments during his summation operated to deprive defendant of a fair trial (see People v Wlasiuk, 32 AD3d 674, 681 [2006], lv denied 7 NY3d 871 [2006]; People v Russell, 307 AD2d at 386-387; People v Tarantola, 178 AD2d at 770-771; see also People v Moore, 115 AD2d at 496), thereby necessitating reversal of defendant's conviction and remittal of this matter for a new trial. Defendant's remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Lahtinen, J.P., Stein and Spain, JJ., concur. Ordered that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and matter remitted to the County Court of Albany County for a new trial.

---

6. To the extent that not all of the challenged statements were preserved by appropriate objections, we find that the comments made by the prosecutor warrant taking corrective action in the interest of justice (see CPL 470.15 [6] [a]).